THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* DELIO ROSARIO GONZÁLEZ, Defendant and Appellant. THE SAME, Plaintiff and Appellee, *v.* THE SAME, Defendant and Appellant.

No. 16390. Submitted May 5, 1958.—Decided May 19, 1958.

*Esteban Susoni Lens* for appellant. *J. B. Fernández Badillo, Attorney General, Arturo Estrella, Assistant Attorney General, Alfredo Archilla Guenard* and *William Fred Santiago, Fiscal* and *Assistant Fiscal of the Supreme Court,* respectively, for appellee.

MR. JUSTICE SALDAÑA delivered the opinion of the Court.

Delio Rosario González was accused in the Superior Court, Arecibo Part, of having violated §§ 6 and 7 of the Weapons Act of Puerto Rico—Act No. 17 of January 19, 1951, Spec. Sess. Laws, p. 426, 25 L.P.R.A. § 411.[1] Both informations were for misdemeanors consisting in having possessed and carried, without a license therefor, an unloaded firearm. Both cases having been jointly tried before a court without a jury, the defendant was found guilty in both and sentenced to eight months in jail in the case of carrying and six months in jail in the case of possession, the latter sentence to be served concurrently with the former. From the judgment thus rendered he appealed to this Court, assigning as only error: *"The trial court committed manifest error, prejudice, and partiality in the weighing of the evidence."* (Italics ours.)

 In appellant's brief the only argument on the error assigned, literally copied, is the following:

"Since the transcript of the evidence is very brief, we will discuss jointly the testimony of the only two witnesses who testified, to wit: Raúl Medina Molina and Osvaldo Galeano González.

"This Hon. Court will notice the open contradiction in the testimony of both witnesses.

---

[1] Section 6 of the Weapons Act of Puerto Rico—25 L.P.R.A. § 416—provides:

"Any person who has or possesses any pistol, revolver, or other firearm without having a license therefor issued as hereinafter provided, shall be guilty of a misdemeanor and, if previously convicted of any violation of this chapter, or of any of the offenses specified in section 427 of this title, or uses the weapon in the commission of any of such offenses, shall be guilty of a felony."

Section 7 of the same Act—25 L.P.R.A. § 417—provides:

"Any person who bears, carries, or transports any pistol, revolver or other firearm without having a license therefor issued as hereinafter provided, shall be guilty of a misdemeanor and, if previously convicted of any violation of this chapter or of any of the offenses specified in section 427 of this title, or uses the weapons in the commission of any of such offenses, shall be guilty of a felony."

"Witness Raúl Medina Molina testified that the defendant took out a revolver and pointed at him, and with the aid of a club he took the revolver away from him and when it fell to the ground Osvaldo Galeano picked it up. In the description of the weapon he merely says that the barrel was short, indicating at the same time that it was about six inches long and nickel-plated.

"Therefore, according to the testimony of Raúl Medina Molina, the defendant was the assailant.

"In the testimony of the other witness, Osvaldo Galeano González, p. 10, line 8, it is said that Raúl Medina Molina hit the defendant, Delio Rosario González, with a club, and that the latter, referring to the defendant, took out a revolver, which he was unable to identify very well because he dropped it.

"At p. 12, line 3, that witness says that the revolver had short, blakish grips, rusty-like. That testimony is in open contradiction with the description made by the first witness who says that it was nickel-plated.

"That witness, in turn, insists that it was a firearm, but he also insists that he was unable to identify it, stating merely that it was a firearm because the cylinder revolved.

"This Hon. Court time and again has stated that when the weapon is not seized, the evidence must be clear and convincing.

"Our question now is this: Is the evidence clear? The only two witnesses presented by the prosecution differ fundamentally in the description of the weapon.

"In view of the foregoing, we believe that the lower court committed prejudice and partiality in the weighing of the evidence, and we pray for the reversal of the judgment."

We have stated time and again that in prosecutions for carrying weapons where the weapon is not presented because it has not been seized the evidence must be clear and convincing. *People* v. *Oquendo*, 79 P.R.R. 511, 515 (1956); *People* v. *Pacheco*, 78 P.R.R. 23, 28 (1955); *People* v. *Garcés*, 78 P.R.R. 95, 100 (1955); *People* v. *Rupizá*, 72 P.R.R. 694, 696 (1951); *People* v. *Guzmán*, 52 P.R.R. 444, 445 (1938); *People* v. *Cartagena*, 37 P.R.R. 261, 264 (1927). There is no doubt that in this case it was. Let us examine

the pertinent parts of the testimony of the two witnesses for the prosecution, Raúl Medina Molina and Osvaldo Galeano González, who testified:

Raúl Medina Molina:

" . . . . . . .

District Attorney: Pointing at the defendant.

Q. On or about August 5 of this year, did you see Delio Rosario and where? —I saw him. I was in the barber shop with my little brother who was having a haircut, and I went out and saw him on Miraflores square.

Q. What is that? —A place, a small square where there are many *cafetines* and the like.

Q. The place where you saw him, is it a public place frequented by people, a small square, or a street? —There, on the street.

Q. What happened? —I left my little brother there near the store of Tiburcio Pérez, and I went over to Delfín's store to get some 'lindberghs' for him and when I returned I found the child crying and I asked him why.

Q. What happened after that? —Then I asked Delio Rosario why he had hit the child. He then said to me: 'So what, I hit the child and I will kill you because I have a revolver here and it is not registered in anybody's name.' When I saw him taking out the revolver and pointing at me, I picked up a club and defended myself with it.

Q. Was José Román there?—Yes, sir.

Q. And who else? —Herminio Astol and the child.

Q. Did he do anything else to any other person? —Yes, sir. Then, while I was standing questioning him, he walked behind me and pushed José Román against me.

Q. Against you? —Yes, sir.

Q. Where did José Román fall? —On the road.

Q. Did he push him against you? —Yes, sir.

Q. Then he took out the revolver? —Yes, sir.

Q. What did he do with the revolver? —People intervened in order to drive us away because he wanted to shoot me.

Q. What did you do? —When he pointed at me I lunged at him and we closed in on each other so I could take the revolver away from him; I had a club in my hand and took the revolver away from him, and when the revolver fell Osvaldo Galeano, who is also here, picked it up.

Q. Will you describe the revolver? —The barrel of the revolver was short and nickel-plated.

Q. How? —Like this.

Prosecuting Attorney: The witness shows six inches.

Q. How was the barrel? —Short.

Q. What color? —Nickel-plated."

When examined by Mr. Reyes Delgado, he testified:

. . . . . . . .

Q. You did not see the revolver before he took it out of his pocket? —No, sir. He took it out of his pocket and looked at it under the light of the lamppost.

Q. Did that happen at night? —About seven o'clock.

Q. Did he look at it in the light like this?—Yes, sir.

Q. Where is the revolver? —Osvaldo Galeano knows because when I hit him with the club and we closed in on each other, so I could take it away from him, he took it.

. . . . . . . .

Q. What did he do first, push Ramón Vélez against you or take out the revolver? —He took out the revolver.

Q. Did he push the other one holding the revolver in his hand? —Yes, sir.

Q. Then he took out the revolver and pointed at you? —Yes, sir.

Q. Immediately? —He took it out like this and at the same time said: 'I have this revolver and it is not registered in anyone's name and am going to kill you,' and he turned around and pushed me against José Román.

Q. Was that what he did? —Yes, sir. Then, when he pushed him and I asked him why he did that, he then ordered the people to clear out so he could shoot me.

Q. Did he do anything to you? —No, sir.

Q. Is Galeano a relative of yours? —No, sir.

Q. And of him? —His first cousin."

Osvaldo Galeano González: Upon being examined by the district attorney, he testified:

" . . . . . . .

Q. Do you refer to the defendant?—Yes, sir.

Q. Are you González? —Yes, sir.

Q. And he also? —Yes, sir. The second surname.

Q. Are you relatives? —Yes, sir.

Q. What is the relationship? —He is my cousin.

Q. First cousins? —First cousins.

Q. How is the relationship between you and him? — . . . . .

Q. Are you his enemy? —Never. We have always got along very well.

Q. Has that friendship been for many years or a short time? —We do not see each other daily.

Q. Do you see each other often? —Often.

Q. Are you on friendly terms? —Yes, sir.[2]

. . . . . . .

Q. Will you explain whether you saw Delio Rosario that day, about seven o'clock in the evening, and what happened, if anything, in which your cousin intervened. —I was in Miraflores square that Sunday, August 5, talking with a friend. Just then Mr. Rosario rode down on a bicycle. I was standing like this and he stopped the bicycle, and Rosario Medina was standing like this with a club hidden behind his back. Then he jumped on Delio Rosario and hit him with the club."

Upon being questioned by the Judge, he testified:

"Q. Who? —Raúl Medina.

Q. Whom? —To Rosario.

Q. The defendant? —Yes, sir. Then, when he hit him, the defendant took out a revolver, a small revolver. I could not identify it because he dropped it and I picked it up.

Q. What did you pick up? —The revolver which he had dropped when the other one hit him. It fell nearby, I saw it at a distance and picked it up, and threw it away just as fast without identifying it. Delio kept saying to me: 'Give me the revolver, give me the revolver,' and I said, 'I threw it away,' frantic closing on me, I said, 'I threw it away.' Then some people gathered around us and took him inside the store of Miguel González, where he stayed. They closed the doors and locked him inside the store."

When examined by the district attorney, he testified:

"Q. Where did Raúl Medina first hit him with the club? —On the right arm.

---

[2] It is to be noted that the witness testified that he was a cousin of the defendant and that they got along very well.

Q. Where? —On the wrist.

Q. Why did he hit him there instead of on the head? —I don't know why.

Q. What did Delio Rosario hold in his hand before receiving the blow? —Before receiving the blow I didn't see anything.

Q. Did you see it afterwards? —When he struck him, the defendant took out the weapon with which he hit him and fell to the ground.

Q. From where did your cousin take out the revolver? —I saw him taking it out of his pocket.

. . . . . . . .

Q. Did he go later to get the revolver? —No, sir.

Q. Who went for the revolver? —That's all I know. After the brawl I went home to bed.

Q. What did the revolver look like? —It seemed to me it had short, blackish grips, rusty-like.

Q. Was it of any other color? —No, sir, I am not sure that I can tell you clearly because I threw it away as soon as I picked it.

Q. Did you pick it from the ground and throw it away immediately? —Yes, sir.

Q. Why did you throw it away? —To avoid trouble."

On cross-examination by Mr. Susoni, he testified:

"Q. You say that you could not tell what kind of weapon it was? —No, sir.

Q. Don't you know if it was a firearm? —I know it was a firearm because I saw the cylinder revolving very rapidly, and it had short, very short grips.

Q. You cannot describe it? —I can not describe it well because I couldn't identify it so rapidly. I know it was a firearm.

Q. How do yo know if you don't know what it looked like? —Because I have seen cap revolvers and know what they look like.

Q. Could it be something else or an imitation, not a firearm? —I know that . . . . .

Q. You can not describe the firearm? —I can not describe it very well, clearly, what the weapon looked like."

Upon being questioned by the Judge, he testified:

"Q. Why, if you can not say what the weapon looked like, did you throw it away to avoid trouble? —I threw it away.

Q. Answer me. —I threw it away because I had the impression and I was sure it was a firearm.

Q. Why do you say that you were sure it was a firearm? —I, actually, it was a revolver.

Q. Why do you say it was a revolver? —Because of the vague impression I had.

Q. What identification did you make to be sure? —When I looked at it.

Q. What did you look at? —The revolver when I picked it up.

Q. At what part of the revolver did you look? —. . . . .

Q. What did you see on the revolver that gave you the impression it was a firearm? —I threw it away.

Q. Why did you throw it away? —. . . . .

Q. Why do you say it was a revolver? —Because I was sure. Because I was sure that what I was seeing was a revolver.

Q. What made you believe that it was a revolver and that you had to throw it away? —I saw the cylinder.

Q. What did you see on the cylinder? What did the cylinder look like? —Round.

Q. Did it revolve? —Yes, sir.

Q. Did it contain anything? —I did not see that it contained anything.

Q. When you picked it up, what did you notice, was it light or heavy? —Heavy."

After these two witneesses testified, the district attorney submitted the case stating:

"The rest of the evidence is cumulative. The testimony of José Ramón Ríos, Herminio Astol, and Adalberto Medina, a minor, is cumulative evidence and we place it at the disposal of the attorney for the defense."

The defense did not present any evidence but merely stated the following:

"We are going to submit the case on that evidence. We believe the evidence is weak. In our opinion, the court has no description of the weapon as required by the rulings of our Supreme Court, to the effect that when the weapon is not seized the description must be such as to leave no doubt at all in the mind of the trier."

As we have seen, the appeal is grounded solely on an alleged contradiction incurred by the two witnesses for the prosecution in describing the weapon. The appellant alleges that one of them said that "the revolver had short, blackish grips, rusty-like," and that the other one testified "that it was nickel-plated." Even assuming that that contradiction constitutes a ground for reversal, the fact is that there was no such contradiction. What one of the witnesses testified was that the *barrel* of the revolver was short and nickel-plated and the other witness that it had short and blackish *grips*, rusty-like. On the other hand, both witnesses are agreed that what the defendant actually took out was a revolver. Witness Medina Molina testified that the defendant took out a revolver from his pocket and aimed it, that its barrel was short, nickel-plated, and that " . . . he looked at it under the light of the lamppost . . . ." Witness Galeano González, who was the one who picked the weapon and threw it away, testified that the defendant had taken out a revolver from his pocket, " . . . a small revolver . . . ," it seemed " . . . to have short, blackish grips, rusty-like . . . ," and that he knew that it was a firearm because " . . . I saw the cylinder revolving very rapidly and the handle was short, very short." That witness further testified that when he picked up the revolver he noticed that it was "heavy."

Although, as pointed out by the appellant, witness Galeano González testified that Medina Molina hit the defendant with the club *before* the latter took out the revolver, and, on the other hand, Medina Molina testified that "when I saw (the defendant) taking out the revolver and pointing at me, I picked up a club and defended myself with it . . . ," this fact does not, however, have a bearing on the responsibility imposed by law for possessing and carrying a weapon without a license.

Therefore, there was actually no conflict in the evidence and the latter established clearly and convincingly the guilt of the accused. But even if a conflict did exist, there is

no showing in the evidence recited above to warrant our disturbing the weighing of the trial judge. *People* v. *Aquino*, 79 P.R.R. 17 (1956); *People* v. *Garcés*, 78 P.R.R. 95 (1955); *People* v. *Piñeiro*, 77 P.R.R. 502 (1954); *People* v. *Comas*, 75 P.R.R. 388 (1953); *People* v. *Millán*, 71 P.R.R. 410 (1950).

One can hardly imagine a more frivolous appeal. However, we have deemed it advisable to write a lengthy opinion for the following reasons: (1) numerous frivolous appeals are being constantly taken to this Court in civil as well as in criminal cases; and (2) the attorneys and the public opinion ought to know the manner in which these frivolous cases overburden the calendar and handicap the work of this Court. The statistics disclose that in the judicial year 1955–56, 645 cases were filed in this Court. During the following year (1956–57), 727 new cases were filed. However, in the latter court year we decided 824 cases. Of this total more than 34 per cent were *frivolous appeals* in civil and criminal cases. That is why in that year we decided 284 appeals "by judgment," that is, without writing an opinion setting forth the grounds of the judgment. However, before rendering judgment *on the merits* it is necessary for the Justices of this Court to examine in each case a record which contains, among other things, the following: *first*, the *complete* transcript of the record of the lower court (*i. e.*, the pleadings, the motions and interlocutory orders, the judgment, etc.); *second*, the transcript of the *entire* oral and documentary evidence presented at the trial; and *third*, the briefs for both parties. Very often a hearing is requested and held to argue the case. And it is always necessary to consider what the decision will be at a conference of all the Justices of the Court.

Therefore, to decide a case "by judgment" saves the work of writing an opinion on obvious matters, but it does not solve the problem created by the frivolous appeals. The problem becomes more serious when in addition to the civil

and criminal appeals we are called upon to decide a considerable number of petitions for certiorari, petitions for review of administrative decisions, habeas corpus petitions, complaints against judges, attorneys, and notaries, motions to dismiss and for reconsideration, disbarment proceedings and removal of judges, matters relating to the Registry of Powers of Attorney and the reports of the Inspectors of Protocols, administrative appeals, etc. See, for example, the Fourth Annual Report of the Administrative Director of the Courts (1955–56) and the Fifth Annual Report of the Administrative Director of the Courts (1956–57). The foregoing does not cover the functions of the Court relative to Bar examinations, the Rules of Ethics for judges and attorneys, the Rules of Evidence, of Civil Procedure, of Criminal Procedure, Administration of the Courts, the Judicial Conference, etc. That work, in its quantitative aspect and in its exigencies of quality, hardly transcends to the public. Few attorneys are, indeed, aware of it.[3] The Reports of this Court only contain the opinions delivered by us. And even the statistics do not reveal all the matters considered and passed upon by this Court because many of such matters are of internal or administrative nature.

It goes without saying that judicial process requires ample time for study and reflection. Furthermore, in order to administer justice and mould adequate juridical doctrines it is indispensable for an integrated court, such as ours, to have undisturbed tranquillity and intellectual composure, without which no discussion would be possible among individuals with properly trained minds.

The judgment appealed from will be affirmed.

Mr. Chief Justice Negrón Fernández did not participate herein.

---

[3] This is due in part to the fact that an order denying a petition for certiorari or for review is not served upon the adverse party. The latter is notified only when the writ is issued. A similar situation arises with motions for reconsideration.